# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| LAJOH THOMAS and PHYLLIS TROTTER, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) Case No. 04-0672-CV-W-GAF ) |
| SAVE-A-LOT and METRO PROTECTIVE SERVICES, | ) ) ) ) |
| Defendants. | ) |

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by Defendant, Niemann Foods ("Neimann") and a Motion for Partial Summary Judgment filed by Defendant, Metro Protective Services[1] ("Metro") ("collectively Defendants") (Docs. #61, #66). Plaintiffs, Lajoh Thomas ("Thomas") and Phyllis Trotter ("Trotter") (collectively "Plaintiffs") allege that, while shopping at a Save-A-Lot grocery store owned by Niemann, Metro's security guards, Jerry Campbell ("Campbell") and Ronald Burch ("Burch") assaulted and battered, intentionally inflicted emotional distress[2] and unlawfully discriminated against them

---

[1] Although Niemann and Metro filed separate Motions, in light of the similarity of the arguments presented, this Court rules on both Motions in the present Order.

[2] Only Trotter alleges intentional infliction of emotional distress.

1

on the basis of race by interfering with their right to contract under 42 U.S.C. § 1981(a) ("§ 1981(a)")[3]. (Doc. #63).

Defendants argue that summary judgment is proper over Plaintiffs' § 1981(a) claims because Plaintiffs have put forth no evidence that Burch or Campbell's actions toward the Plaintiffs were racially motivated, and neither Burch nor Campbell interfered with or prevented Plaintiffs from making or enforcing contracts under § 1981(a). (Docs. #62, #67). Defendants further argue that summary judgment is proper over Trotter's intentional infliction of emotional distress claim because neither Burch nor Campbell intended to cause emotional harm or distress to Trotter. Id. Niemann argues that summary judgment is proper on Plaintiffs' assault and battery claims against it because Burch and Campbell were employees of Metro, not Niemann. For the reasons set forth more fully below, Niemann's Motion for Summary Judgment on all claims against it is GRANTED, and Metro's Motion for Partial Summary Judgment on Plaintiffs' § 1981(a) claims and Trotter's claim for intentional infliction of emotional distress is GRANTED.

## **DISCUSSION**

**I.     Facts**

This case arises from an incident that occurred on January 25, 2003 at a Save-A-Lot grocery store at 3410 Troost Avenue in Kansas City, Missouri[4]. (Doc. #63). Niemann is the owner of the Save-A-Lot store, and on January 25, 2003 and thereafter, Metro provided security services for Niemann. Id.

---

[3]Metro moves for summary judgment on only the § 1981(a) and intentional infliction of emotional distress claims.

[4]These facts are derived entirely from the Plaintiffs' depositions and complaint unless otherwise noted. The Court recognizes that many of the facts and allegations are disputed by Metro and Niemann. However, for purposes of summary judgment, none of the factual disputes are material.

On January 25, 2003, Thomas and Trotter entered the Save-A-Lot to buy groceries. Id. Both Thomas and Trotter are African-American. Id. Trotter is Thomas' mother. Id. While shopping, Thomas examined a peach and touched it, but did not pick it up. Id. After Thomas touched the peach, she continued to shop with Trotter, and the Plaintiffs were followed around the store by employees of Metro. Id. After completing their shopping, Trotter paid for the groceries they had purchased in the amount of $116.00. Id. None of the employees of Metro or Save-a-Lot told Plaintiffs that they could not purchase the groceries or prevented the Plaintiffs from purchasing the groceries. (Thomas Dep. 27: 15-21).

After Trotter purchased the groceries, two Caucasian employees of Metro, Campbell and Burch, approached Thomas as she was on her way to bag the groceries. (Thomas Dep. 47: 16-48:2). Campbell asked Thomas to empty her pockets and open her purse. (Thomas Dep. 47: 19-21). When Thomas asked why she was being detained, Campbell stated that he had reason to believe Thomas had a peach in her pocket. (Thomas Dep. 49: 21-25). Thomas emptied her pockets, where no peach was found, and requested an apology. (Thomas Dep. 49: 17-23). Campbell smirked and stated that he did not have to apologize. (Thomas Dep. 49: 17-23). When Thomas asked a second time for an apology, Campbell stated that he did not have to apologize because he had probable cause to believe Thomas had stolen a peach. (Thomas Dep. 51: 10-15).

Thomas then told Campbell that he wouldn't treat her this way if she were a white woman, and that he would not have approached her like that if he were a black security officer. (Thomas Dep. 51: 21-22). Campbell responded, "you know where you're at," which Thomas interpreted as a reference to the neighborhood where the Save-a-Lot was located. (Thomas Dep. 52: 7-11). When questioned at her deposition about the basis for her belief that Campbell would have treated her differently had she been

3

white or had he been black, Thomas stated, "If a black security officer would have stopped me and–I mean, if I would have emptied my pockets and came up empty like I did, I feel that a black security officer would apologize and, you know, told me he was sorry for what happened." (Thomas Dep. 52: 12-21). Thomas did not know Campbell before January 25, 2003, did not know his history working with customers at Save-A-Lot, and did not know how he tended to treat African Americans versus whites. (Thomas Dep. 52: 22-53:7).

After Thomas told Campbell that he wouldn't treat her this way if she were white or if he were black, Campbell told Thomas to bag her groceries and get out of the store. (Thomas Dep. 53: 22-54:5). Thomas asked to speak to a manager. (Thomas Dep. 54: 6-9). One of the cashiers went to get the manager. (Thomas Dep. 54: 14-16). At the same time, two customers who had witnessed the conversation between Campbell and Thomas began asking for refunds. (Thomas Dep. 54: 11-25). Thomas was in the process of bagging her groceries when one customer said to Thomas, "you want your money back" and "don't get anything from here." (Thomas Dep. 54: 11-25).

Thomas approached Save-A-Lot manager Mike LaRoche ("LaRoche"), a Niemann employee, and tried to explain what had happened. (Thomas Dep. 56: 6-7). LaRoche told Thomas that he was aware of the situation and that they had probable cause [to believe she had stolen a peach]. (Thomas Dep. 56: 7-9). Thomas stated, "I've been falsely accused of stealing a peach and you're just telling me you have probable cause–I don't deserve an apology or anything?" (Thomas Dep. 58: 14-17). LaRoche told Thomas again that they had probable cause, and Thomas then asked for her money back. (Thomas Dep. 58 : 17-23). LaRoche agreed to give Thomas a refund, and Trotter gave LaRoche the receipt. (Thomas

4

Dep. 59: 2-6). LaRoche began processing refunds for the two other customers who had asked for refunds. (Thomas Dep. 59: 6-7).

While LaRoche was processing refunds, Thomas engaged in a second round of conversation with Campbell. (Thomas Dep. 60: 18-21). Thomas raised her voice, was visibly angry, and called Campbell a "white racist motherfucker." (Thomas Dep. 61: 3-17). Thomas states that she was prompted to call Campbell a "white racist motherfucker" because Campbell told her that he was "used to dealing with people like [Thomas]" and "he served two years in the pen."[5] (Thomas Dep. 61: 1-5). After Thomas called Campbell a "white racist motherfucker," Campbell allegedly called Thomas a "black bitch." (Thomas Dep. 62: 18-25).

Thomas asked the cashier why it was taking LaRoche so long to give her a refund. (Thomas Dep. 64 23-25). LaRoche had been walking around the store with Trotter's receipt in his hand, and when he came back to the front of the store he appeared to be looking for something or trying to figure out how to give Thomas a refund. (Thomas Dep. 65: 1-6). Thomas believed LaRoche was stalling. (Thomas Dep. 67: 4). Thomas had "had enough," so she told LaRoche she wanted her money. (Thomas Dep. 65: 6-7). LaRoche told Thomas that if she would have "shut her fucking mouth" she would have gotten her money. (Thomas Dep. 65: 7-9). At that point, Thomas called LaRoche a "white racist motherfucker." (Thomas Dep. 65: 11-12). LaRoche then told Thomas to get out of the store. (Thomas Dep. 68:22-69:2). Thomas turned around to walk away, but remembered that LaRoche had not given her the money. (Thomas Dep. 69: 5-7). She turned around and said, "Give me my fucking money." (Thomas Dep. 69: 5-7).

---

[5]Campbell in fact has never served time in prison, nor has he ever worked as a security guard in a prison. (Campbell Dep. 9: 14-17; 33:13-19).

5

At that point, Thomas claims she was attacked by Campbell. (Thomas Dep. 69: 8-9). LaRoche never made physical contact with Thomas and never directed Campbell to make physical contact with Thomas. (Thomas Dep. 71: 16-20). Thomas claims that Campbell hit her on the left side of her face. (Thomas Dep. 72: 6-14). Campbell and Thomas ended up on the ground and Campbell was on top on Thomas. (Thomas Dep. 74: 1-2). While they were on the ground, Thomas claims that she was getting hit on the side of her head and she was grabbing at Campbell's eyes. (Thomas Dep. 74: 16-20).

Trotter grabbed Campbell to get him off of Thomas. (Trotter Dep. 43: 17-19). Burch then grabbed Trotter's arm and twisted her around so that she broke loose from Campbell. (Trotter Dep. 43: 22-23). Trotter grabbed for Campbell again, and Burch grabbed Trotter again. (Trotter Dep. 43: 24-25). Trotter claims that Burch twisted Trotter around, slammed her into the area near the cash register, and held her down with his body weight. (Trotter Dep. 43: 25-44: 2). It is Trotter's understanding that Burch's purpose in grabbing her was to prevent her from making physical contact with Campbell. (Trotter Dep. 50: 5-8). Trotter does not believe that Campbell's sole purpose for having a physical altercation with Thomas was to cause Trotter emotional distress. (Trotter Dep. 54: 14-18). Trotter does not believe that Burch's action of grabbing her arm was intended to make her emotionally upset. (Trotter Dep. 72: 23-73: 1). When asked at her deposition if she had any reason to believe that any of the actions were taken against her out of racism, Trotter answered, "To myself, no." (Trotter Dep. 69: 23-70:2). When asked if anyone from either Metro or [Niemann] said anything racially offensive to Trotter, Trotter answered, "No." (Trotter Dep. 69: 19-22). Before leaving the Save-A-Lot store on January 25, 2003, Trotter received a refund for her $116.00 worth of groceries. (Thomas Dep. 68: 16-21).

6

The physical altercation between Thomas and Campbell lasted approximately two or three minutes. (Thomas Dep. 75: 23-24). After some of the other customers in the store broke up the fight, and after Thomas got up, Thomas hit Campbell. (Thomas Dep. 74: 7-11). At some point, someone called the police. (Thomas Dep. 79: 1-2). With Thomas present, the police watched the security footage of the incident. (Thomas Dep. 82: 9-15). The police issued Thomas a trespassing ticket, which she would not accept. (Thomas Dep. 81: 8-10). Thomas ultimately pled guilty to the trespassing charge. (Thomas Dep. 81: 11-15).

As a result of the physical altercation, Thomas had scratches near her eyes from where her glasses cut her. (Thomas Dep. 73: 6-7). However, Thomas had no bruises or other marks on the left side of her face where Campbell allegedly hit her. (Thomas Dep. 73: 3-7). Thomas does not have any photographs depicting any physical injuries she claims to have sustained as a result of the incident. (Thomas Dep. 73: 14-17). Trotter claims that, following the incident, she was sore and achy on her back and chest but had no visible signs of injury. (Trotter Dep. 60:10-61:10). Trotter also alleges that the incident caused her to suffer from emotional distress, which still continues. (Trotter Dep. 77: 7-11).

Defendants argue that summary judgment is proper over Plaintiffs' § 1981(a) claims because Plaintiffs have put forth no evidence that the Defendants intended to discriminate against them on the basis of race, and because no employee of either Niemann or Metro interfered with or prevented Plaintiffs from making or enforcing contracts under § 1981(a). (Docs. #62, #67). Defendants further argue that summary judgment is proper over Trotter's intentional infliction of emotional distress claim because neither Campbell's nor Burch's motivation, either in restraining Trotter or in engaging in a physical altercation with Thomas, was to cause Trotter emotional distress. Id. Niemann argues that because Campbell and Burch

7

were employees of Metro, Niemann is not liable for their actions and summary judgment should be granted on Plaintiffs' assault and battery claim against it. (Doc. #62).

Plaintiffs argue that the Court should not grant summary judgment on their § 1981(a) claims because there is sufficient evidence to demonstrate that Defendants' actions towards them were racially motivated, and because Defendants actions were so unbearable that Plaintiffs were forced to relinquish their contract rights and demand refunds. (Docs. #72, #78). Plaintiffs also argue that a genuine issue of material fact exists regarding whether Campbell's and Burch's actions were intended solely to cause Trotter emotional distress. Id. Finally, Plaintiffs argue that summary judgment should not be granted on their claims for assault and battery because Niemann employee LaRoche allegedly asked Campbell and Burch to follow the Plaintiffs, thereby exercising control over their subsequent actions and subjecting Niemann to liability under the doctrine of *respondeat superior*. (Doc. #78).

**II.     Standard**

Defendants filed their Motions for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering these Motions, the Court views all facts in the light most favorable to the Plaintiffs and gives them the benefit of all reasonable inferences. *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

8

An issue of material fact is "genuine" if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). When the evidence supports conflicting conclusions, a *genuine* issue of material fact exists and summary judgment should be denied. Kells v. Sinclair Buick—GMC Truck, Inc., 210 F.3d 827 (8th Cir. 2000) (emphasis added). The "materiality" of a disputed fact is determined by the substantive law governing the claim. Anderson, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) *citing* Anderson, 477 U.S. at 248.

The Defendants bear the burden of proving the absence of disputed material facts. *See* Prudential Ins. Co., 121 F.3d at 366. The burden then shifts to the Plaintiffs to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the Plaintiffs fail to establish a factual dispute on an essential element of their case, the Court will proceed to determine whether Defendants are entitled to judgment as a matter of law. *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001). The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

**III. Analysis**

*A. Plaintiffs' § 1981(a) Claims*

Section 1981(a) provides:

(a) Statement of Equal Rights

9

> All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

Plaintiffs claim that Metro and Niemann deprived Plaintiffs of enjoying the benefit of their contractual relationship with Save-A-Lot. (Docs. #72, #78). The purpose of the "make and enforce contracts" provision of § 1981(a) is to prohibit discrimination in the "performance, modification, and termination of contracts" and to protect "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002). When a claim under § 1981(a) is based on inferences to be drawn from circumstantial evidence, it is governed by a burden-shifting analysis. Id., *citing* Carter v. St. Louis Univ., 167 F.3d 398, 401 (8th Cir. 1999). First, a plaintiff must put forth sufficient evidence to support a prima facie case of race discrimination. Id. To do this, a plaintiff must show: (1) that he or she is a member of a racial minority; (2) that the defendants intended to discriminate against him or her on the basis of race; and (3) the discrimination concerned an area enumerated by the statute. Id.

If a plaintiff puts forth evidence to support a prima facie case of race discrimination, the burden shifts to the Defendants to offer a non-discriminatory reason for its actions to rebut the presumption of race discrimination. Id., *citing* Carter, 167 F.3d at 401. The burden then shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for unlawful discrimination. Id.

The Plaintiffs cannot make out a prima facie case of discrimination because the alleged discrimination did not concern an area enumerated by the statute. Defendants argue that summary

10

judgment is proper over Plaintiffs' § 1981(a) claims because no employee of either Metro or Niemann interfered with or prevented Plaintiffs from making or enforcing contracts[6]. (Docs. #62, #67). Plaintiffs argue that § 1981(a) is implicated in that the actions of the Defendants were so unbearable that Plaintiffs were forced to relinquish their contract rights and demand refunds. (Docs. #72, #78).[7]

In the grocery store context, one cannot violate one's right to make and enforce contracts after the purchase is complete because no contractual relationship remains. Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 854 (8th Cir. 2001). In Youngblood, an African American customer sued Hy-Vee, alleging that the store violated his rights under § 1981(a) by detaining him on suspicion of stealing beef jerky. Id. at 853. A store employee suspected that the customer had crammed the contents of one beef jerky container into another container that he purchased. Id. The store employee approached and detained the customer after he had already purchased the container of beef jerky. Id. The customer claimed that the store violated his right to contract under § 1981(a). Id. The trial court entered summary judgment in favor of the store, and the customer appealed. Id.

On appeal, the Eighth Circuit considered whether any contractual relationship remained after the customer completed his purchase. Id. at 854. The court held that no contractual relationship existed,

---

[6]Defendants also argue that Plaintiffs have put forth no evidence that the Defendants intended to discriminate against them on the basis of race. (Docs. #62, #66). However, because the alleged discrimination clearly does not concern an area enumerated by § 1981(a), this Court will not decide whether Plaintiffs have put forth evidence to create a genuine issue of material fact as to whether the Defendants intended to discriminate against them on the basis of race.

[7]Plaintiffs also allege that Defendants' actions implicate the "full and equal benefits of the laws" language of § 1981(a). However, because the state is the sole source of the law, only the state can deny the full and equal benefit of the law. Youngblood, 266 F.3d 851 at 855; Bediako v. Stein Mart, Inc., 354 F.3d 835, 838 (8th Cir. 2004). Plaintiffs do not allege that Niemann or Metro are state actors.

11

because once the customer had paid the cashier and received the beef jerky from the cashier, neither party owed the other any duty under the retail-sale contract. Id. The court concluded that once the purchase is complete, no contractual relationship remains. Id., *citing* Lewis v. J.C. Penney Company, Inc., 948 F. Supp. 367, 372 (D. Del. 1996).

In the instant case, as in Youngblood, the alleged discrimination occurred after Plaintiffs had purchased their groceries. Plaintiffs allege that Campbell approached Thomas and accused her of stealing a peach after Trotter had already paid $116.00 for the groceries. (Doc. #63). Further, all of the alleged facts that give rise to Plaintiffs' claims of discrimination, assault and battery, and intentional infliction of emotional distress occurred after Trotter paid $116.00 for their groceries. Plaintiffs admit that none of Niemann or Metro's employees told them they could not purchase their groceries or prevented Plaintiffs from purchasing their groceries. (Thomas Dep. 27: 15-21). As such, at the time the alleged facts giving rise to Plaintiffs' claims occurred, no contractual duty remained between the Plaintiffs and either Niemann or Metro.

Plaintiffs argue that § 1981(a) is implicated in that the actions of the Defendants were "so unbearable" that Plaintiffs were "forced" to relinquish their contract rights and demand refunds. (Docs. #72, #78). Plaintiffs cite no law whatsoever to support the proposition that exposure to rude employees thereby forces customers to relinquish contract rights and demand refunds. Moreover, Plaintiffs have provided no factual allegations in support of the argument that they were "forced" to relinquish their contract rights and demand refunds. Indeed, Thomas was bagging the groceries in preparation for leaving the store when another customer suggested, "you want your money back" and "don't get anything from here." (Thomas Dep. 54: 11-25). Plaintiffs chose to purchase groceries, and they were not prevented

12

from doing so. (Thomas Dep. 27: 15-21). Plaintiffs chose to ask for a refund, and they were given a refund. (Thomas Dep. 68: 16-21).

Neither Metro nor Niemann violated Plaintiffs' rights to make and enforce contracts under § 1981(a). Absent such evidence, Plaintiffs cannot make out a prima facie case under § 1981(a). Accordingly, both Metro and Niemann are entitled to summary judgment on Plaintiffs' § 1981(a) claims.

*B. Trotter's Intentional Infliction of Emotional Distress Claim*

To state a claim for intentional infliction of emotional distress under Missouri law, a plaintiff must prove extreme and outrageous conduct by a defendant who recklessly or intentionally caused severe emotional distress that resulted in bodily harm. Sansonetti v. City of St. Joseph, 976 S.W.2d 572, 579 (Mo. App. W.D. 1998) *citing* Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. banc 1997). The conduct must have been "...so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Gibson, 952 S.W.2d at 249.

An essential element of the tort of intentional infliction of emotional distress is that the conduct must be intended **only** to cause extreme emotional distress to the victim. Thomas v. Special Olympics Missouri, Inc., 31 S.W.3d 442, 446 (Mo. App. W.D. 2000) *citing* K.G. v. R.T.R., 918 S.W.2d 795, 799 (Mo. banc 1996) and Gibson, 952 S.W.2d at 249 (emphasis in original). In fact, one must allege not just that the actor knew that emotional distress would result from his or her acts but that inflicting emotional distress was the **sole** motivation for the actor's conduct. *See* Id. at 448 (emphasis in original). The Missouri Supreme Court has held that, "Where one's conduct amounts to the commission of one of the traditional

torts, such as battery, and the conduct was not intended only to cause extreme emotional distress to the victim, the tort of emotional distress will not lie[.]" K.G., 918 S.W.2d at 799.

Again, the Plaintiffs have cited no law in support of their argument that summary judgment should not be granted on Trotter's claim for intentional infliction of emotional distress. Instead, Plaintiffs merely offer the conclusion that, "To say that Officer Burch's intentional stand by attitude, in light of what was going on between his male partner and a woman customer, was not solely intended to upset Mrs. Trotter is unreasonable and illogical." (Doc. #78). However, the Plaintiffs have offered no facts whatsoever to support the conclusion that either Campbell's or Burch's purpose, let alone their sole purpose, in engaging in a physical altercation with Thomas and/or restraining Trotter, was to cause emotional distress to Trotter.

In the instant case, the record is clear that neither Campbell's nor Burch's sole motivation was to cause extreme emotional distress to Trotter. Trotter claims that when she tried to pull Campbell off of Thomas, Burch grabbed Trotter, twisted her around, slammed her into the cash register, and held her down with his body weight. It is Trotter's understanding that Burch's purpose in grabbing her was to prevent her from making physical contact with Campbell. Trotter does not believe that Burch's action of grabbing her arm was intended to make her emotionally upset. Trotter does not believe that Campbell's sole purpose for having a physical altercation with Thomas was to cause Trotter emotional distress. Thus, Trotter does not claim that either Campbell's or Burch's motivation, either in restraining her or in engaging in a physical altercation with Thomas, was to cause her emotional distress. The Plaintiffs have presented no facts, nor can any inferences be reasonably drawn, to suggest that Trotter's own beliefs are incorrect. Accordingly, both Metro and Niemann are entitled to summary judgment on Trotter's emotional distress claim.

*C. Plaintiffs' Assault and Battery Claims Against Niemann*

14

Niemann argues that summary judgment is proper on Plaintiffs' assault and battery claims against it because Burch and Campbell were employees of Metro, not Niemann. (Doc. #62). Under Missouri law, "[o]nly if a master-servant relationship exists between the parties does the doctrine of *respondeat superior* act to impose liability on an employer." Lee v. Pulitzer Pub. Co., 81 S.W.3d 625, 631 (Mo. Ct. App. 2002). To determine whether the doctrine of *respondeat superior* applies to impose liability on Niemann, it must be determined whether Niemann had the right to control or to direct the physical conduct of Metro's security guards, Campbell and Burch. *See* Id. *citing* Studebaker v. Nettie's Flower Garden, Inc., 842 S.W.2d 227, 229 (Mo. App. E.D. 1992).

In arguing that Niemann had the right to control or direct the physical conduct of Campbell and Burch, Plaintiffs allege that "Officer Campbell stated in his deposition that LaRoache [sic], the manager at Save A Lot on the date in question, instructed them to follow Plaintiffs" [8]. (Doc. #78). Plaintiffs do not cite the portion of Campbell's deposition where this statement was allegedly made. In fact, review of Campbell's entire deposition revealed that Plaintiffs' counsel never asked Campbell in his deposition about whether anyone instructed him to follow Plaintiffs, nor did Campbell ever state voluntarily that LaRoche instructed him or Burch to follow Plaintiffs. Campbell gave no testimony in his deposition from which the faintest inference can be drawn that LaRoche instructed Campbell or Burch to follow Plaintiffs. Instead,

---

[8]Plaintiffs also assert that "LaRoache [sic] had power and control of the entire situation and could have diffused rather than inciting the tense environment of the matter by refunding the Plaintiffs their money in a timely fashion." (Doc. #78). The length of time it took LaRoche to refund Plaintiffs' money is irrelevant to the analysis of whether Niemann is liable under the doctrine of *respondeat superior* for the actions of Campbell and Burch.

15

Plaintiffs have fabricated Campbell's deposition testimony in an attempt to mislead the Court and survive summary judgment on their assault and battery claims against Niemann.

Apart from concocting false testimony, Plaintiffs have presented no evidence whatsoever which supports the assertion that Niemann had any right to control the actions of Campbell and Burch. Plaintiffs agree that LaRoche never directed Campbell to make physical contact with Thomas. Plaintiffs further agreee that Niemann retained Metro to provide security services, and that Campbell and Burch were employees of Metro. (Docs. #62, #63). Plaintiffs have presented no evidence to support the conclusion that a master-servant relationship existed between Niemann and either Campbell or Burch. Plaintiffs have failed to present even a scintilla of evidence that Neimann is liable under the doctrine of *respondeat superior* for the actions of Metro employees Campbell and Burch. Consequently, Niemann is entitled to summary judgment on Plaintiffs' assault and battery claims against it.

## CONCLUSION

Because Plaintiffs have presented no evidence in support of their claims that either Metro or Niemann violated their right to make and enforce contracts under § 1981(a), both Niemann and Metro are entitled to summary judgment on Plaintiffs' § 1981(a) claims. Further, both Niemann and Metro are entitled to summary judgment on Trotter's claim for intentional infliction of emotional distress, as the Plaintiffs have presented no facts, nor can any inferences be reasonably drawn, to suggest that either Campbell's or Burch's purpose in engaging in a physical altercation with Thomas or restraining Trotter was to cause emotional distress to Trotter. Finally, Niemann is entitled to summary judgment on Plaintiffs' assault and battery claims because Plaintiffs have presented absolutely no evidence to support the conclusion that Neimann had any right to direct the actions of either Burch or Campbell. Accordingly,

16

Niemann's Motion for Summary Judgment on all claims against it is GRANTED and Metro's Motion for Partial Summary Judgment on Plaintiffs' § 1981(a) claims and Trotter's claim for intentional infliction of emotional distress is GRANTED.

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED:	January 5, 2006